**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MASSACHUSETTS DELIVERY ASSOCIATION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MAURA HEALEY, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH,**<br><br>**Defendant.** | **Civ. Action No. 10-cv-11521** |

**MEMORANDUM AND ORDER**

**CASPER, J.** **July 8, 2015**

## I. Introduction

Plaintiff Massachusetts Delivery Association ("MDA") has filed this lawsuit against Defendant Maura Healey,[1] in her official capacity as Attorney General of the Commonwealth of Massachusetts (the "Attorney General"), seeking a declaration that the "B prong" of the Massachusetts Independent Contractor Law, Mass. Gen. L. c. 149, § 148B(a)(2), is preempted by the Federal Aviation Administration Act of 1994 ("FAAAA"), 49 U.S.C. § 14501, and for an injunction barring the Attorney General from enforcing Section 148B against MDA's members. D. 22. Both MDA and the Attorney General have moved for summary judgment. D. 156 (MDA's renewed motion for summary judgment); D. 174 (renewing the Attorney General's

[1] MDA originally filed this lawsuit against Martha Coakley in her official capacity at the time as the Attorney General of the Commonwealth of Massachusetts.

prior cross motion, D. 82). For the reasons stated below, the Court ALLOWS MDA's motion and DENIES the Attorney General's motion.

## II. Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (quoting Anderson, 477 U.S. at 249) (alteration in original). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III. Factual Background

This factual summary recounts the undisputed material facts. MDA is a trade organization representing entities engaged in the business of same-day delivery service. D. 73 ¶ 1 (MDA's statement of undisputed material facts); D. 175 at 1 (Defendant's response to plaintiff's statement of undisputed material facts). Most MDA members hire independent

contractors to provide delivery services. Id. One such MDA member, offered by MDA as an exemplar for the purpose of this suit, is X Pressman Trucking & Courier, Inc. ("Xpressman"). D. 73 ¶ 2; D. 175 at 2. Xpressman provides both "scheduled route" and "on-demand" delivery services through independent contractors who utilize their own cars or trucks. D. 73 ¶¶ 3-4; D. 175 at 2. Scheduled route service requires package pick-up and delivery at scheduled times and locations. D. 73 ¶ 5; D. 175 at 2. Xpressman has approximately 100 scheduled routes operated by 46 couriers. D. 73 ¶ 6; D. 175 at 3. On-demand service, on the other hand, is variable. D. 73 ¶ 7; D. 175 at 3. Xpressman fields requests from its clients for unscheduled, rush deliveries. Id. Couriers who provide on-demand service contact Xpressman each day to indicate their availability. D. 73 ¶ 8; D. 175 at 3. Xpressman then matches its clients' requests with the couriers' stated availability. Id. Xpressman contracts with twelve on-demand couriers, but only seven make twenty on-demand deliveries on an average day. D. 73 ¶ 9; D. 175 at 3.

As of October 2012, Xpressman employed six full-time and two part-time employees who performed administrative and warehouse duties. D. 73 ¶ 10; D. 175 at 4. They were paid a salary or hourly wage and received health insurance and 401(k) plan benefits (including a four percent contribution match by Xpressman). D. 73 ¶ 11; D. 175 at 4. For these employees, Xpressman also provided workers' compensation insurance, paid payroll taxes and contributed to unemployment insurance. Id. By contrast, Xpressman's independent contractor couriers are paid by route and do not receive benefits such as health insurance or 401(k) benefits. D. 73 ¶ 13; D. 175 at 5. Xpressman also does not provide workers' compensation, pay payroll taxes or contribute to unemployment insurance for its independent contractors. Id.

## IV. Procedural History

MDA instituted this action on September 7, 2010. D. 1. The Court allowed the Attorney General's motion to dismiss on the basis of abstention pursuant to Younger v. Harris, 401 U.S. 37 (1971). D. 9, 37. The First Circuit reversed and remanded. Mass. Delivery Ass'n v. Coakley, 671 F.3d 33 (1st Cir. 2012) ("MDA I"). MDA then moved for summary judgment and the Attorney General cross-moved for summary judgment. D. 67, 82. The Court denied MDA's motion and allowed the Attorney General's motion in part, holding that the FAAAA did not preempt Section 148B. D. 123. Upon appeal, the First Circuit reversed, holding that Section 148B "clearly concerns a motor carrier's 'transportation of property'" and directing the Court to "determine . . . whether Section 148B satisfies the broad preemption test based on a review of the full record." Mass. Delivery Ass'n v. Coakley, 769 F.3d 11, 23 (1st Cir. 2014) ("MDA II"). In doing so, the First Circuit "express[ed] no view on the sufficiency of the evidence before the district court." Id. at 22.

MDA now renews its motion for summary judgment, D. 156, and the Attorney General renews her cross-motion for summary judgment, D. 174. The Court heard the parties on the pending motions and took these matters under advisement. D. 181.

## V. Discussion

### A. The Statutes at Issue and Prior Cases

The FAAAA expressly preempts certain state laws pertaining to motor carriers, stating that "a State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). The First Circuit determined that Section 148B "clearly concerns a motor carrier's 'transportation of property.'" MDA II, 769 F.3d at 23. The Court also held that Section 148B "potentially impacts

the services the delivery company provides, the prices charged for the delivery of property, and the routes taken during this delivery." Id. As directed by the First Circuit, the issue before the Court is whether "this effect on delivery companies' prices, routes, and services rises to the requisite level for FAAAA preemption." Id.

Section 148B provides a three-pronged test to determine whether "an individual performing any service" is an independent contractor. The individual must be "free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact;" the service must be "performed outside the usual course of business of the employer;" and "the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." Mass. Gen. L. c. 149, § 148B(a). At issue here is the second of these requirements, the so-called "B prong," because couriers hired to provide delivery services are without exception performing within the usual course of business of the delivery companies.

"The Supreme Court has instructed that the 'related to' language . . . is meant to be construed broadly, consistent with Congress's intention that . . . preemption should have an expansive reach." Tobin v. Fed. Express Corp., 775 F.3d 448, 454 (1st Cir. 2014) (addressing breadth of preemption under the Airline Deregulation Act). "The phrase 'related to' . . . embraces state laws 'having a connection with or reference to' carrier 'rates, routes or services,' whether directly or indirectly." MDA II, 769 F.3d at 17 (quoting Dan's City Used Cars, Inc. v. Pelkey, 133 S. Ct. 1769, 1778 (2013)). "Under this rubric, a state statute is preempted if it expressly references, or has a significant impact on, carriers' prices, routes, or services." Id. at 17-18. The First Circuit characterizes this "related to" test as "purposely expansive" and "sweeping," id. at 18, but not as limitless. "State laws whose effect is only 'tenuous, remote, or

peripheral' are not preempted." Id. (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 390 (1992)). Neither the Supreme Court nor the First Circuit has expressed a view as to "where it would be appropriate to draw the line" between an impact that is "significant" as opposed to "tenuous, remote, or peripheral." Morales, 504 U.S. at 390 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100 n.21 (1983)); see Nationwide Freight Sys., Inc. v. Ill. Commerce Comm'n, No. 13-3316, 2015 WL 1840568, at * 8 (7th Cir. Apr. 23, 2015) (noting that "the Supreme Court has not yet had occasion to identify precisely what types of effects will be too insignificant to trigger preemption, because the cases that the Court has decided . . . have not been close to the line, whatever the line may be"); DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 86 (1st Cir. 2011). A state law, however, "may be preempted even if it is indirectly or generally applicable." MDA II, 769 F.3d at 20 (quoting Bower v. Egypt Airlines Co., 731 F.3d 85, 95 (1st Cir. 2013)).

The First Circuit instructs this Court to "engage with the real and logical effects of the state statute" in its determination of whether Section 148B "has a forbidden significant effect on even one motor carrier." Id. at 20, 21. Even the "'potential' impact on carriers' prices, routes, and services can be sufficient if it is significant, rather than tenuous, remote or peripheral." Id. at 21. "[E]mpirical evidence is [not] necessary to warrant FAAAA preemption" if the "logical effect that a particular scheme has on the delivery of services or setting of rates" is "sufficient even if indirect." Id. "[W]e are following Congress's directive to immunize motor carriers from state regulations that threaten to unravel Congress's purposeful deregulation in this area." Id.

The goal of the FAAAA is to "creat[e] an environment in which '[s]ervice options will be dictated by the marketplace,' and not by state regulatory regimes." N.H. Motor Trans. Ass'n. v. Rowe, 448 F.3d 66, 80 (1st Cir. 2006), aff'd, 552 U.S. 364 (2008) (quoting H.R. Conf. Rep. 103-

677 at 88). Congress sought to "ensure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces,' thereby stimulating 'efficiency, innovation, and low prices,' as well as 'variety' and 'quality.'" Rowe v. N.H. Motor Trans. Ass'n., 552 U.S. 364, 371 (2008) (quoting Morales, 504 U.S. at 378).

**B. Section 148B is Preempted by the FAAA**

The First Circuit has held that empirical evidence is not required to demonstrate FAAAA preemption, MDA II, 769 F.3d at 21 (citing Rowe, 448 F.3d at 82 n.14), a holding it recently reaffirmed. Overka v. American Airlines, Inc., No. 14-1869, 2015 WL 3635328, at * 4-5 (1st Cir. June 12, 2015) (rejecting "a categorical rule" that there must be "a record on the effect [of the challenged scheme] on . . . prices or services"). Instead, courts may examine "'the logical effect that a particular scheme has on the delivery of services or the setting of rates.'" MDA II, 769 F.3d at 21 (quoting Rowe, 448 F.3d at 82 n. 14); accord, Overka, 2015 WL 3635328, at * 5. This "logical effect can be sufficient even if indirect" so long as it is "significant, rather than tenuous, remote, or peripheral." MDA II, 769 F.3d at 21. With these dictates in mind, the Court turns to the record as it bears on the logical effect of Section 148B on routes, services and prices.

*1. Effect on Xpressman's routes*

Several changes resulting from the application of Section 148B would require Xpressman to modify the delivery routes it serves, i.e., if Xpressman's independent contractors were now classified as employees. One example provided by MDA is that, while independent contractors use their own vehicles, industry standard calls for employees to drive company-owned cars. D. 158 at 8; D. 73 ¶¶ 20-21; D. 175 at 7 (not disputing industry standard but asserting that employees may use their own cars if they are reimbursed for vehicle operating costs). The use of delivery vehicles owned by Xpressman, instead of being owned by its independent contractors,

has the potential to require Xpressman to change its routes. Even as the Attorney General posits that "[i]t is viable" for employees to use company-owned vehicles for personal transportation, D. 175 at 7, this contention does not address the potential effect on routes that MDA has shown. If, in keeping with the industry standard, Xpressman provided company cars for its couriers, this would require the delivery company to incur the expense of acquiring and maintaining a fleet of delivery vehicles and to incorporate "stem miles" into each courier's route – the miles driven between the delivery company's location and the first and last route stops. D. 73 ¶ 22; D. 175 at 7 (noting that "stem miles" are not required by Section 148B). Xpressman calculates that the additional stem miles would increase miles driven by 28 percent and hours worked and paid by 15 percent. D. 73 ¶ 22; D. 175 at 6-8 (disputing assumed wage rate). Such a practice, the logical effect of Section 148B on Xpressman's routes, would at least force a delivery company to charge higher prices that allow it to recoup these costs and to alter routes that formerly would begin and end at the courier's own residence.

Further, Section 148B's effect on routes is implicated by the meal break provision of Chapter 149. A thirty-minute, unpaid meal break must be offered to any person required to work more than six hours per day. Mass. Gen. L. c. 149, § 100. Xpressman contends that its routes requiring more than six consecutive hours of driving would have to be modified. D. 158 at 3, 20; D. 73 ¶ 46; D. 175 at 16 (responding that many, but not all, routes do not require more than six hours of driving or have a thirty minute break built into the route). The Attorney General's argument that it would not be difficult for Xpressman to find drivers willing to forego the meal break is unavailing. D. 174 at 22. A delivery company cannot be forced to conduct its business in reliance upon finding workers willing to waive their statutorily provided entitlements. Similarly, the Attorney General's remedy for the Sunday work statute, which imposes sanctions

on an employer who requires an employee to work on Sunday unless the employee is afforded a day off during the ensuing six days, Mass. Gen. L. c. 149, § 47, is for Xpressman to find drivers who wish to work on Sundays and waive their right to their days off. D. 174 at 24. This solution cannot form the basis of a lasting business model. If compliance with Section 148B hinders the opportunity to provide daily delivery service without the contingency of adding drivers to a route or constricts a route to fewer than six hours of driving, now or in the future, then Section 148B impermissibly affects a delivery company's routes in a significant way.

*2. Effect on Xpressman's services*

The First Circuit instructs that a service "represents a bargained-for or anticipated provision of labor from one party to another, thus leading to a concern with the contractual arrangement between the [carrier] and the user of the service." Tobin, 775 F.3d at 453 (internal quotation marks omitted). MDA asserts that Xpressman would have to abandon its "on-demand" delivery business if it were required to classify the couriers who provide that service as employees. D. 158 at 21; D. 73 ¶¶ 43-44; D. 175 at 15. Massachusetts regulations require that employees must be paid for time spent on call if the employee is not "effectively free to use his or her time for his or her own purposes." 455 C.M.R. § 2.03(2). Xpressman represents that providing on-demand courier services profitably depends upon the availability of a flexible workforce that does not need to be compensated while waiting for a job. D. 158 at 21. The Attorney General argues that the couriers, when not providing on-demand services, are free to use their time for their own purposes and nothing prevents the couriers from holding another job when not making deliveries for Xpressman. D. 174 at 20. Assuming that a courier does as the Attorney General suggests and secures a second job, however, that courier would then be unavailable to make an on-demand delivery for Xpressman during certain hours. At present,

when Xpressman receives a request for an on-demand delivery, it calls its independent contractors who may decline or accept each on-demand job offered to them. D. 158 at 3; D. 177 at 9. As employees, they would no longer have the option of declining a delivery. D. 177 at 9. They would be required to complete the delivery when requested, precluding them from working for another employer during the hours Xpressman requires them to be available. Id. at 9-10. If Xpressman is to satisfy requests for prompt, unscheduled deliveries, then it logically must retain employees who are on-call and who must be compensated for that time, which is different from its current business model. Retaining on-call employees forces Xpressman to incur costs that translate into increased prices. D. 73 ¶ 44; D. 175 at 15 (disputing that employees must be paid for being on call). Conversely, if Xpressman endeavors to maintain its current prices, then the practical effect of Section 148B is to force it to abandon a service now demanded by the competitive marketplace.

"[W]hen a state law directly substitutes the state's own policies for competitive market forces, the state law produces precisely the effect the preemption clause seeks to avoid: 'a patchwork of state service-determining laws, rules and regulations.'" Tobin, 775 F.3d at 455 (quoting Rowe, 552 U.S. at 373) (concluding that plaintiff's claims would require defendant to perform certain services at the expense of alternative services, an effect that was not tenuous, remote or peripheral). Similarly, here, Massachusetts seeks to enforce a policy of hiring employees when market forces have prompted delivery companies to adopt an independent contractor model. The law would have the effect of limiting a courier company to the provision of scheduled service at the expense of on-demand deliveries.

Furthermore, to avoid increased costs, delivery companies would logically need to assign multiple delivery routes (those requiring only a couple of hours to complete, for instance) to one

employee. See D. 174 at 32; D. 73-1 ¶ 20 (noting that some of Xpressman's routes take as little as two hours to complete and that eight couriers have routes that take fewer than four hours). Such a modification, however, affects the service offered by the delivery companies to clients. The routes of clients that require that their deliveries be completed early in the day could not be combined with routes of other clients who also require morning deliveries. If delivery companies are forced to adjust the timing of each route, then, as in Tobin, the effect is not tenuous, remote or peripheral. And, even if such balancing of route timing could be achieved with Xpressman's present client base, constant rebalancing would be required for Xpressman to remain responsive to its existing and new clients' needs because "the demands of the market could change at any time." Tobin, 775 F.3d at 456. "The purpose of [FAAAA] preemption is to enhance [delivery companies'] reliance on competitive market forces in order to shape their prices, routes, and services not at one particular moment in time but, rather, in response to the protean demands of the market." Id.

*3. Effect on Xpressman's prices*

The potential logical, if indirect, effect of Section 148B is to increase Xpressman's prices by increasing its costs. There are myriad additional costs incurred by a delivery company that depends upon employees as opposed to independent contractors. For example, the employer must pay payroll taxes, such as Social Security, Medicare and unemployment insurance. D. 73 ¶ 34. In addition, as discussed above, Xpressmen has proffered evidence that industry standards would require it to supply company vehicles to its drivers who currently use their own vehicles for deliveries, id. ¶ 20; D. 73-2 at 15, and thereby incur the expense of acquiring and maintaining a fleet of delivery vehicles. As previously discussed, this arrangement also requires Xpressman's couriers to drive "stem miles." D. 73-2 at 11, 15. Alternatively, the delivery

company could forego investment in delivery vehicles and instead reimburse courier-employees for the miles they drive in their own cars. D. 73-2 at 10-11; D. 175 at 7. While saving "stem miles," this alternative again presents an increase in costs, in the form of vehicle mileage reimbursements, that is likely to have an effect on the prices charged by delivery companies. D. 73-2 at 10-11; United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 336 (1st Cir. 2003) (noting that statutory scheme that required UPS to obtain proof of recipient's payment of excise tax prior to package delivery "create[s] a substantial burden on UPS, in the form of additional labor, costs, and delays" and, therefore, the statutory scheme fell within the scope of FAAAA preemption).

Application of Section 148B also implicates the obligations imposed by Chapter 151. Mass. Gen. L. c. 149, §148B(a) & (d). Chapter 151 obligates employers to ensure that, no matter how employees are paid, they receive at least the minimum wage. Mass. Gen. L. c. 151, § 1. Here, Xpressman pays its couriers by the route. D. 73 ¶ 13. Although Xpressman would not be required to compensate its employees by the hour, it would have to incur the expense of tracking each employee's hours to ensure compliance with the minimum wage law. Mass. Gen. L. c. 151, § 15. Moreover, Chapter 151 requires that employees receive time-and-a-half for any hours worked beyond a forty-hour work week. Mass. Gen. L. c. 151, § 1A. Any routes requiring more than forty weekly hours to complete, now or in the future, would require multiple employees to avoid the additional labor expense when only one independent contractor is required at present to service the route. See D. 85-2 ¶ 3 (noting that couriers may drive more than 40 hours per week to make deliveries). The implication is that the price charged for the route would increase due to the overtime pay Xpressman would owe to the courier dedicated to the route requiring in excess

of forty hours per week to complete. Alternatively, to avoid incurring overtime costs, the route itself would have to be altered to accommodate the assignment of multiple couriers.

The Attorney General maintains that Section 148B does not mandate the application of other employment laws, namely Chapter 62B, the state income tax withholding laws, and Chapter 152, the workers' compensation laws, because each provides its own definition of "employee."[2] D. 174 at 14-15. Section 148B references Chapters 149 and 151, Mass. Gen. L. c. 149, § 148B(a) (applying definition of independent contractor to chapter 151) and (d) (imposing penalties for improper classification that also violates certain sections of chapter 149), but Chapters 62B and 152 each separately define "employee." Mass. Gen. L. c. 62B, § 1 (defining "employee" in accordance with the Internal Revenue Code, 26 U.S.C. § 3401(c), except for certain full time students); Mass. Gen. L. C. 152, § 1(4) (defining "employee" as "every person in the service of another under any contract of hire, express or implied, oral or written" with certain exceptions). While the Attorney General may be correct that enhanced remedies are available only if an individual is improperly classified under both Section 148B and either Chapter 62B or Chapter 152, Mass. Gen. L. c. 149, § 148B(d), the Attorney General interprets too narrowly the "forbidden significant effect" triggering a finding of preemption. MDA II, 769 F.3d at 21. That effect can be indirect, and the logical effect of classification as an employee under Section 148B, which specifically mentions both Chapters 62B and 152, is to increase the likelihood of meeting the "employee" definition provided in the latter statutes. The Attorney General suggests a hybrid model where workers are considered to be employees under some statutes and to be independent contractors under others. D. 174 at 26-27. This notion imposes a

[2] In MDA II, the First Circuit noted the parties' dispute regarding the extent of the state statutes implicated by Section 148B. 769 F.3d at 15 n.1. The First Circuit also reiterated that "[w]e previously noted that the classification was relevant to chapters 62B, 149, 151, and 152 of the Massachusetts General Laws." Id. (citing MDA I, 671 F.3d at 36).

significant burden on employers who must determine how to classify each worker with respect to each statute. The Attorney General provides no examples of such an arrangement operating in practice.[3]

Chapter 62B would require Xpressman to withhold income tax on behalf of its employees, Mass. Gen. L. c. 62B, § 2, while Chapter 152 calls for employers to provide workers' compensation benefits, Mass. Gen. L. c. 152, § 25A. Without deciding whether Chapters 62B and 152 would be applicable to Xpressman's couriers should they be classified as employees under Section 148B, the Court observes that each statute imposes potential additional costs on an employer which are likely to be passed on to the consumer in the form of increased prices.

The Attorney General also insists that Section 148B does not trigger application of any federal statutes. D. 174 at 13. Again, the Attorney General improperly limits her analysis of the statutes triggered by Section 148B to only the explicit and narrow language of the statute. Although no federal statute is specifically named in Section 148B, the practical and significant, if indirect, effect of an employee classification under the law is to require adherence to a host of other laws. For example, under the Patient Protection and Affordable Care Act (the "ACA"), some employers are required to offer health insurance to eligible employees who work thirty or more hours each week. See 26 U.S.C. § 4980H. In addition, while federal law does not require

[3] The Supreme Judicial Court's recent decision in Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 322-23 (2015), in which the court held that licensed taxicab drivers could be classified as independent contractors in accordance with Section 148B and the regulations governing the Boston taxicab industry, does not dictate another conclusion here. The Attorney General asserts that the case shows that employment status under Section 148B does not trigger laws pertaining to workers' compensation, unemployment insurance and payroll taxes. D. 184 at 1. Those statutes and the interpretations of them, however, make it clear that taxicab drivers are excluded. Sebago, 371 Mass. at 337-38 n.12 (citing Mass. Gen. L. c. 152, § 1(4)), n.13 (citing Commissioner of the Div. of Unemployment Assistance v. Town Taxi of Cape Cod, 68 Mass. App. Ct. 426, 430-32 (2007)), n.14 (citing Rev. Rul. 71-572). No analogous explicit guidance regarding how couriers would be construed under the relevant statutes exists here. Moreover, Sebago did not address or settle the question of preemption before this Court.

employers to provide retirement plans pursuant to 26 U.S.C. § 401(k), delivery companies such as Xpressman that already offer such plans (to its eight employees) are likely to continue to offer them, especially where the provision of valuable fringe benefits aids in the recruitment of a quality workforce. Although incurring the cost of matching employees' contributions to a 401(k) plan is voluntary, it is reasonable to expect delivery companies to incur the expense in a competitive marketplace and, therefore, is properly considered a logical, indirect effect of the Section 148B classification.

MDA has submitted evidence quantifying the extent of the increase in costs Xpressman would incur if its independent contractors had to be converted to employees. D. 73-2; D. 73-3; D. 158 at 9; D. 180. The Attorney General responds that MDA "greatly exaggerates" and "double-counts" these costs, D. 174 at 32, creating an issue of material fact that precludes summary judgment. Id. at 32-37. Specifically, the Attorney General contends that Xpressman overstates the number of couriers it would need to hire to service its business and their wage rate, id. at 32-33; the costs of employee benefits and other employee-related expenses, such as workers' compensation, social security and Medicare, id. at 33-34, 35-37; and the costs of recruiting and hiring its workforce, id. at 34-35. Even crediting the Attorney General's objections to Xpressman's calculations, the Attorney General does not argue that there would be no increase in Xpressman's costs. To the contrary, the Attorney General concedes that there would be a cost increase, just that it would be less than the increase asserted by MDA, and thus not significant enough to warrant a finding of preemption. D. 174 at 31, 34. Using the Attorney General's own assumptions, however, the cost increase that would face Xpressman should its couriers be deemed employees is, at a minimum, more than negligible, and logically would

translate into higher prices charged to Xpressman's customers. D. 180 at 3. Such an effect is more that tenuous, remote or peripheral.

Moreover, much of the Attorney General's dispute about the effect on routes, services and prices focuses on the necessary impact of Section 148B, based on the statutory text, rather than on the potential or indirect impact of classification as an independent contractor. See, e.g., D. 175 at response 17 (provision of fringe benefits and mileage compensation not imposed by Section 148B); response 19 (Section 148B requires paying minimum wage, not industry standard wage rate); response 22 (stem miles not required by Section 148B); response 30 (health insurance costs not imposed by Section 148B); response 33 (401(k) benefits not required by Section 148B). Even where implicated industry standards or statutes would result in changes to routes, services or prices, the Attorney General argues that Xpressman can simply make other choices in how it operates its business. See, e.g., id. at response 20 (employers may require employees to use their own cars so long as employees are compensated for the mileage driven); response 21 (employers may permit employees to use company owned cars for personal transportation); response 46 (law allows for employees to waive statutory meal break). MDA II, however, instructs that the "related to" test is "purposefully expansive." 769 F.3d at 18. "Potential" impact on routes, services and prices is sufficient so long at is "significant, rather than tenuous, remote and peripheral." Id. at 21. Indeed, the First Circuit stated that Section 148B "potentially impacts the services the delivery company provides, the prices charged for the delivery of property, and the routes taken during this delivery." Id. at 23. The inquiry required to be made by the Court is not limited to the narrow requirements explicitly imposed by Section 148B, but instead must look to the potential and logical impact of the statute, even if that impact is indirect. Xpressman is not required to deviate from industry standards or to devise detours

around statutory strictures invoked by Section 148B to avoid that impact. To do so would allow state regulation to "threaten to unravel Congress's purposeful deregulation in this area." Id. at 21.

Applying First Circuit and Supreme Court precedent, the Court concludes that the logical, if indirect, effect of the application of Section 148B to delivery companies such as Xpressman results in modification of prices (due to higher costs), routes and services. The Court notes, however, that not all First Circuit precedent points clearly in the direction of preemption. The First Circuit in DiFiore implied that a state law regulating a company as an employer or the employment relationship between a company and its workers is not preempted. In determining that Massachusetts's tips law, as applied to the fee charged by airlines for curbside baggage check by skycaps, was preempted by the Airline Deregulation Act, the Court observed that the statute "does more than simply regulate the employment relationship between the sky caps and the airline . . . ."[4] 646 F.3d at 87. It concluded that "the tips law as applied here directly regulates how an airline service is performed and how its price is displayed to customers – not merely how the airline behaves as an employer or proprietor." Id. at 88; see Tobin, 775 F.3d at 456 (noting that "[i]n DiFiore, we drew the preemption 'dividing line' between state laws that regulate 'how [a] service is performed' (preempted) and those that regulate how an airline behaves as an employer or proprietor (not preempted)"). Moreover, the DiFiore Court specifically rejected the defendant's argument that any state regulation is preempted where it imposes costs and thus affects prices. Id. at 89. Yet, at the same time, the Court cautioned that

[4] The relevant part of the Airline Deregulation Act's preemption provision is identical to the preemption provision in the FAAAA and thus the case law considering the former aids in the interpretation of the latter. Dan's City, 133 S. Ct. at 1778.

the effect of a law on prices and services is not tenuous even if a defendant can comply with the law without incurring great expense. Id. at 88.

DiFiore, however, also counseled that a statute that has a direct connection to prices and services "can fairly be said to regulate both." 646 F.3d at 87. As such, the tips statute did "more than simply regulate the employment relationship between the skycaps and the airline." Id. Even though the primary service of an airline is the flight itself and skycap services could be viewed as ancillary, the Court still concluded that the tips law was preempted. In contrast, in the delivery context, how the delivery service is performed (by employees or independent contractors) is nearly identical to the delivery company's role as an employer. The courier is both the face of the company and the ultimate provider of the core service offered by Xpressman. In regulating who may provide Xpressman's primary services, Section 148B has a direct connection to the services themselves and thus more than the mere employment relationship between Xpressman and its couriers is at issue here.

In summary, Section 148B logically has a significant effect on Xpressman's prices, routes and services and, therefore, Prong B of Section 148B is preempted by the FAAAA. Such preemption is as a matter of law where, as discussed above, Prong B of Section 148B operates as a bar on the business model of same-day delivery service using independent contractors, such as Xpressman, where the service performed by the courier is not outside of the usual course of business of the employer. Preemption is also as applied given the logical effect of Prong B of Section 148B on the routes, services and prices of a courier service like Xpressman, based upon the record in this case, as discussed above.

**C. The extent of preemption**

A court should "not nullify more of a legislature's work than is necessary." Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 329 (2006). The relief requested by MDA is a declaration that the B Prong of Section 148B is preempted by the FAAAA, D. 177 at 13 & n. 17, and that is the extent of the Court's ruling today.[5]

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS MDA's motion for summary judgment, D. 156, and DENIES the Attorney General's cross-motion for summary judgment, D 82, 174.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

[5]Although the amended complaint sought both declaratory and injunctive relief, the Court understands from counsel's representation at oral argument that MDA was now seeking only declaratory relief, 3/4/15 transcript at 48, 62, and that is the extent of the relief granted in this Memorandum and Order.